UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GERALD L. DAVIS & ASSOCIATES, )
INC., d/b/a GDI, Inc., )
 )
    Plaintiff, )
 ) No. 3:04-0580
v. ) JUDGE ECHOLS
 )
EDWARDS TELECOMMUNICATIONS, )
INC., and BROADBAND TELE )
COMMUNICATIONS, INC., )
 )
    Defendants. )

## MEMORANDUM

Pending before the Court is Defendants' Joint Motion For Summary Judgment (Docket Entry No. 38), to which the Plaintiff has responded in opposition.

### I. FACTS AND PROCEDURAL HISTORY

Plaintiff Gerald L. Davis & Associates, d/b/a GDI, Inc. ("GDI") is a Georgia corporation. Defendant Edwards Telecommunications, Inc. ("Edwards"), is a South Carolina corporation, and Defendant Broadband Tele Communications, Inc. ("Broadband"), is a Florida corporation.

The parties were involved in a project to install approximately twenty-two miles of aerial fiber optic cable in Nashville, Tennessee, for American Fiber Systems ("AFS"), the owner of the fiber optic cable. AFS is known as a "dark fiber provider." AFS constructs a fiber optic ring and then markets to clients

1

twenty-year leases to use one or many of the fibers to transport various forms of data. (Docket Entry No. 41, Ex. A, Storm Depo. at 23.)

AFS hired Viasys Utility Services, Inc., d/b/a Viasys ("Viasys"), a Florida corporation, to serve as general contractor in Phase II of the Nashville project. Viasys hired Plaintiff GDI to install the fiber optic cable. GDI in turn hired two subcontractors to conduct the installation, Defendants Edwards and Broadband.

The type of fiber optic cable installed in Nashville is called "ribbon fiber," which is comprised of twelve glass fibers within each of thirty-six ribbons stacked one on top of the other in a rectangular package inside a thin sheath or jacket. The ribbons are surrounded by moisture-blocking gel within the jacket. The stacking of ribbons creates a 432-fiber cable approximately three-quarters of an inch in diameter. When a rectangular configuration of this kind is bent too sharply, the inside of the bend is shortened or compressed and the outside is elongated or stretched. The stacked ribbons slide to the side like a deck of cards if normal industry standards are not followed during installation. Improper handling of the cable can break or bend the fibers so that they will not pass signal and are unusable. A loss of one or two fibers during installation is acceptable, but the owner of the fiber makes the final decision as to what amount of loss is

acceptable. The cable has a minimum bending radius of twenty times its diameter to avoid damage to the fibers. Prior to installation, the cable was stored on large reels, each of which held a three-mile length of the cable. Nine reels were used in the Nashville project. (Id. at 52, 59-60, 62, 64-65, 74-75, 88; Docket Entry No. 53-2, Ex. A, Gadd Depo. at 56, 66; Docket Entry No. 53-6, Ex. D, Woods Expert Report at 5.)

Before the reels left the factory, the manufacturer, Lucent/OFS, tested the fiber optic cable for any defects. A "birth certificate" accompanying each reel from the factory to AFS certified that the cable was tested and no manufacturing defects were found. (Docket Entry No. 41, Ex. A, Storm Depo. at 47.) AFS shipped the reels to Viasys in Nashville, where they were stored in a secure warehouse. (Id. at 37, 93-94.)

Viasys hired a local Nashville company to test the fibers again for breaks or bends before the reels were taken from the warehouse into the field for installation. The testing process took about one week. (Id. at 38-39, 41, 48, 80.) The testing involved use of an Optical Time Dominion Reflectometer ("OTDR"). An OTDR test can be conducted at a frequency of 1310 or 1550 nanometers. The higher frequency is a more reliable test and shows different information than the lower frequency test. (Id. at 55-56, 81.) However, the OTDR test at 1310 frequency will disclose broken or dead fibers. (Id. at 81.) The OTDR tests conducted for

3

Viasys at the Nashville warehouse used the 1310 frequency. (Id. at 56.) Keith Storm, project engineer for Viasys, was personally present at the warehouse at times when the testing was underway, and he made sure the testing company completed its task. (Id. at 48-50.) He received from the testing company a "book of traces" and backup CDs, which showed the results of the testing on each one of the 432 fibers in each of the nine reels. The pre-installation testing was "clean." (Id. at 86.) Storm forwarded the book of traces and the CDs to AFS. He did not keep copies. (Id. at 42-44.)

Storm then worked with GDI to schedule installation of the cable. (Id. at 44-45.) GDI pulled the manufacturer's "birth certificates" from the reels and kept them. (Docket Entry No. 53-2, Ex. A, Gadd Depo. at 42-43.)

After the cable was installed and spliced, final OTDR bidirectional testing at both 1310 and 1550 nanometers revealed several broken and bent fibers at a point in the cable located beyond five ninety-degree turns. (Docket Entry No. 41, Ex. A, Storm Depo. at 50-51, 56, 65-66, 82-83, 89.) Reel 1 showed 25 faults, reel 6 showed 19 faults, and reel 7 showed 11 faults. (Docket Entry No. 53-5, Ex. C, Woods Depo. at 36.) Bends in the fibers were so severe that they were visible even on 1310 frequency. The testing at 1310 frequency prior to installation did

4

not reveal such bends. (Docket Entry No. 53-3, Ex. A, Gadd Depo. at 48, 128.)

AFS refused to accept the installation because it did not meet specifications. AFS also refused to allow GDI to make additional splices to replace the damaged cable. (Id. at 70-71.) GDI removed the cable that came from reels 1, 6 and 7 and replaced them with new fiber optic cable.

In Storm's opinion, the damage occurred because the cable was pulled through too many ninety-degree turns "without pulling the slack out" as required by industry standards. He testified he had provided a copy of the industry standards to GDI. (Id. at 89, 91.)

Billy Gadd worked for GDI during the installation, and he has been designated as an expert for GDI in this case. During installation of the cable, he observed a subcontractor construction crew lashing cable without using a required "90 block" at a corner pole. (Docket Entry No. 53-3, Gadd Depo. at 98, 100.) He stopped the crew and told them the cable did not have steel strength members in it and that a "90 block" must be used. (Id.) One crew member stated he had a "90 block," but it was on another truck. The crew should have had a copy of the installation specifications with them. (Id. at 101.)

Another of GDI's experts, Bennie Woods, testified that he reviewed the OTDR 1330 tests that were done on the cable for Viasys prior to installation. (Docket Entry No. 53-5, Ex. C, Woods Depo.

5

at 33-34, 76.) In his opinion, the fibers were damaged because the cable was bent too sharply. (Id. at 67.) He was unaware of any fiber optic cable owner who would accept cable as damaged as this one was. (Id. at 63.) Even during replacement of reel 7, he observed that the construction crew did not tend the reel and did not maintain the minimum bend radius of the cable. He tried to talk to the foreman of the crew, but the foreman did not seem to understand what Woods was talking about. (Id. at 57, 83, 86.)

According to the First Amended Complaint, Viasys and GDI incurred substantial costs for purchase and installation of replacement fiber optic cable. (Docket Entry No. 9 at ¶ 11.) Viasys filed suit against GDI, and GDI agreed to a settlement in excess of $75,000. (Id. at 23.) GDI brought this action against its subcontractors alleging claims for breach of contract, negligence, indemnification, and breach of warranty.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether

there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Defendants Edwards and Broadband move for summary judgment on the ground that GDI cannot prove its claims because of the absence of the original pre-installation test results showing the fiber optic cable was in proper working condition when it left the

7

warehouse in Nashville. The "book of traces" and the backup CDs that Viasys sent to AFS following the pre-installation OTDR testing apparently have not been produced in this litigation. Defendants suggest the only evidence supporting GDI's claim that the cable was in proper working order when it left the warehouse is the unsubstantiated hearsay testimony of Keith Storm. Defendants challenge Storm's statement that testing was done on the cable prior to its delivery to Defendants as based on conjecture rather than personal knowledge. Moreover, because GDI lacks even a copy of the pre-installation test results, GDI cannot comply with Federal Rule of Evidence 1002.

Taking the facts in the light most favorable to GDI, the Court concludes that the joint motion for summary judgment must be denied because Defendants have not established they are entitled to judgment as a matter of law. See Anderson, 477 U.S. at 248. GDI correctly observes that it has no legal duty to prove facts that would support a defense Defendants may attempt to raise at trial, such as the existence of a manufacturing defect.

More importantly, however, a genuine issue of material fact exists for trial because a reasonable jury could return a verdict for the nonmoving party, GDI, on claims of breach of contract, negligence, breach of warranty or indemnification. See id. Storm testified he was present when OTDR testing was conducted at the warehouse, he personally received the test results in a "book of

8

traces" and backup CDs, and he forwarded the materials to AFS. Storm verified that the pre-installation testing was "clean." This testimony is not hearsay, as Defendant's contend, because Storm spoke from his own personal knowledge. Storm witnessed improper cable handling procedures in the field, and in his opinion, the cable damage occurred because of improper installation at ninety-degree turns.

Furthermore, GDI's experts, Gadd and Woods, both testified they reviewed the results of the manufacturer's OTDR testing at 1310 and 1550 wavelengths and no manufacturing defects were present when the reels of cable left the factory. Gadd and Woods also reviewed the pre-installation test results obtained by Viasys for two of the three reels that were damaged. Gadd and Woods determined that improper installation methods caused the cable damage. They, too, observed construction crews using improper installation techniques in the field.

This testimony is sufficient for GDI to defeat Defendants' summary judgment motion and proceed to trial on its claims for breach of contract, negligence, indemnification, and breach of warranty. Defendants do not make any other challenge to GDI's ability to prove the elements of each claim. At trial, however, Defendants are not precluded from making a "best evidence" objection under Rule 1002 concerning the Viasys pre-installation test results if such an objection is appropriate on the evidence as

9

it stands at that time. Cf. Ridgway v. Ford Dealer Computer Serv., Inc. 114 F.3d 94, 98 (6th Cir. 1997)(observing Rule 1002 objection was well-grounded where party introduced oral evidence of contract and failed to introduce written contract, but objection was not made and was therefore, waived).

## IV.   CONCLUSION

GDI has produced sufficient evidence of mishandling of the fiber optic cable by construction crews in the field to defeat Defendant's joint motion for summary judgment and to proceed to trial on all claims. Defendants may raise at trial any "best evidence" objection concerning the Viasys pre-installation test results. Accordingly, Defendants' Joint Motion for Summary Judgment (Docket Entry No. 38) will be DENIED.

An appropriate Order shall be entered.

*[signature]*
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

10